(No. 19850.—

WILLIAM BROSS LLOYD *et al.* Plaintiffs in Error, *vs.* JOHN BROSS LLOYD, Defendant in Error.

*Opinion filed October 25, 1930—Rehearing denied Dec. 5, 1930.*

DUNN, C. J., and DEYOUNG, J., dissenting.

SCOTT, BANCROFT, MARTIN & MACLEISH, and THOMAS S. EDMONDS, (JOHN E. MACLEISH, LELAND K. NEEVES, and FRED SCHROEDER, JR., of counsel,) for plaintiffs in error.

MICHAEL D. REILLY, and JAMES P. HARROLD, for defendant in error.

Mr. COMMISSIONER EDMUNDS reported this opinion:

The issue here presented arises out of a bill filed in the circuit court of Cook county to construe an indenture of trust, the point involved being whether a certain sum of money which came into the hands of the trustees under the circumstances hereinafter detailed constituted net income to the life beneficiary or belonged to the corpus of the trust estate. The chancellor held that the money did not constitute net income and entered a decree accordingly. An appeal was taken to the Appellate Court, which held that the money constituted net income, reversing the decree and remanding the cause, with directions to enter a decree in accordance with such view. The cause is now before this court on *certiorari*.

By the indenture of trust, which was executed June 19, 1913, William Bross Lloyd, Henry Demarest Lloyd and John Bross Lloyd were vested, as trustees, with various items of real and personal property, including 125 shares of stock in the Tribune Company. The indenture provided, among other things, that "after the payment of all proper charges the trustees shall pay over the net income of said property, or so much thereof as said John Bross Lloyd requests, for his maintenance, support, education and enjoyment, at convenient intervals, not exceeding three (3) months apart, * * * during the term of his natural life."

Disposition of the principal and income after John's death was made by other clauses of the indenture.

The Tribune Company was organized under a special charter in 1861, and throughout its entire existence has had a capital stock of $200,000, divided into 2000 shares of $100 each. Its charter provides that it may purchase and hold real estate, not exceeding 200 front feet, on any street in Chicago, and may erect suitable buildings thereon; that deeds shall be authorized by at least two-thirds of the stock, and that the company may lease any real estate necessary to carry on its business and sub-let to others space not needed by it. In 1902 the company completed the erection of a twelve-story office building at the corner of Dearborn and Madison streets, Chicago. Shortly thereafter five additional stories were added thereto. From the time of completion of this building the company occupied a portion thereof for its main plant and leased the remainder to outside tenants. The ground under the building comprised six lots, three of which the company had leased directly from the board of education of the city of Chicago in 1880. The leaseholds covering the remaining lots were purchased in 1897 and 1899 for $162,000. The investment in the building as of December 31, 1902, as shown on the books of the company, was $1,236,077.15. It is further shown that as of December 31, 1903, the investment in the building was $1,624,220, making a total investment in leaseholds and building as of that date, disregarding a small item of amortization, of $1,786,220. On the date of creation of the trust herein involved the investment in the building, exclusive of depreciation, is shown as $1,806,534.01. On December 31, 1920, it had increased to $1,892,817.47. No further increase is shown thereafter. The value of the building and leaseholds as of December 31, 1924, is shown as $2,102,932.05. Exhibits introduced in evidence tended to show that $550,000 was borrowed from the McCormick and Patterson families for use in the construction of the

building and its equipment, all of which loans were outstanding on December 31, 1902, and that $117,000 was authorized to purchase a portion of the leaseholds. That some earnings might have been used in connection with the building is indicated by resolutions which authorized such a disposition of them. Comparison of the surplus as of December 31, 1900, and the surplus as of December 31, 1902, together with consideration of the earnings and dividends paid, shows that the earnings for the two years 1901 and 1902 not distributed as dividends were not sufficient to account for the increase in the investment in the building. In 1920 the company moved a portion of its plant to a new building erected by it on Michigan avenue, and by 1925 had moved to the new building all but one department. In accordance with a plan outlined in a letter to all stockholders, the building at Dearborn and Madison was disposed of in 1925. To effect this disposition a corporation known as the Dearborn and Madison Building Corporation was organized. The Tribune Company conveyed the leaseholds and building to this corporation, receiving in exchange 40,600 shares of stock of the Dearborn and Madison Building Corporation. These 40,600 shares were then immediately distributed to the Tribune Company stockholders *pro rata,* the Lloyd trustees receiving as their *pro rata* share 2537½ shares. As part of the plan, Stone and Keplinger then purchased all these shares directly from the stockholders at $100 per share, and the Lloyd trustees were accordingly paid the sum of $253,750. Resolutions in accordance with which this plan was carried out were adopted unanimously by both stockholders and directors of the Tribune Company, each resolution providing that when a conveyance had been consummated and the stock of the Dearborn and Madison Building Corporation received by the Tribune Company, it should be re-issued to the stockholders of the Tribune Company *pro rata,* according to their respective holdings, "as a dividend * * * out of

the last accumulated earnings of this corporation." In handling the transaction the $4,060,000 was entered as surplus, and $2,486,857.15 appeared upon the books of the Tribune Company as a profit on the sale of the building. On December 31, 1925, after the building and leaseholds and the stock of the Dearborn and Madison Building Corporation had been disposed of, the surplus of the Tribune Company amounted to $14,999,080.71. Surplus as of December 31, 1903, was $1,783,162.08, on December 31, 1912, it was $2,977,273, on December 31, 1913, it was $2,331,838.54, and on December 31, 1924, it stood at $12,929,985.39. A dividend of $3,500,000 was declared in 1922, and was followed by dividends of $3,300,000 in 1923, $2,600,000 in 1924, $2,400,000 (exclusive of the above stock disbursements) in 1925, and $3,200,000 in 1926.

The principles of law heretofore applied by this court in determining whether dividends received by a trustee constitute net income payable to the life beneficiary or capital which belongs to the remainderman are in accord with those followed by the Supreme Court of Massachusetts. (*De-Koven* v. *Alsop,* 205 Ill. 309; *Blinn* v. *Gillett,* 208 id. 473; *Billings* v. *Warren,* 216 id. 281.) In a recent case involving a corporate resolution to the effect that a certain dividend was made from surplus assets, that court, following the principles which it had laid down in previous decisions, held that effect should be given to such resolution, and that no examination would be conducted into the corporate accounts for the purpose of ascertaining the original sources of money or property distributed as a dividend. (*Gray* v. *Hemenway,* 168 N. E. 102.) In all essential particulars the facts in that case closely parallel those disclosed by the present record. We deem the result therein reached to be sound and the reasons advanced therefor to constitute convincing reasons for giving effect to the corporate resolutions in the present case and holding that the money in controversy constitutes income.

In the *Gray case* the Delaware, Lackawanna and Western Railroad Company had owned in fee 13,277 acres of coal lands, together with leases of coal lands and improvements and equipment of such lands, both owned and leased. The books of the railroad company did not show the capital expenditures made in acquisition of coal properties, but upon the best available estimates the cost of coal lands owned in fee was upwards of $10,000,000, of which at least $8,000,000 represented capital contributed by stockholders or surplus later capitalized by the issue of stock dividends. A part of the coal lands owned in fee and the leases of coal lands were acquired and paid for out of earnings. About $43,000,000 had been expended from time to time in development, plant and equipment of the properties and charged to surplus. Prior to 1921 the properties had been carried on the books at a nominal figure bearing no relation to their cost or value. No reason for so entering them was apparent of record. In 1921, pursuant to a plan to segregate the coal properties and the business of the railroad company, the coal properties were sold to the Glen Alden Coal Company, a corporation, and the railroad company received in exchange $60,000,000 in bonds of the coal company. On August 25, 1927, the railroad company held $58,500,000 of these bonds. On that date the directors of the railroad company adopted a plan whereby these bonds were transferred to the Lackawanna Securities Company, and the securities company issued all of its capital stock *pro rata* to the railroad company's stockholders in consideration therefor. The resolution of the railroad company stated that the bonds were a part of its surplus assets, and the transfer was charged against surplus on the balance sheet of the railroad company, leaving a surplus, after the transfer, of more than $80,000,000. As shown by the balance sheet, the number of shares of stock of the railroad company and the capital were the same after the transfer as before. After stating that the question was presented

whether the distribution of the securities company stock was to be treated by the trustees as income for the beneficiaries for life or capital to be held for the remaindermen the court said: "It has frequently been said in our decisions that in determining the nature of a dividend the substance rather than the form will be considered; but this ordinarily does not mean that the court must conduct an examination into the accounts of a corporation and its history for the purpose of ascertaining the original sources of money or property distributed as a dividend or the time when money or property distributed was acquired. The substance and intent, as shown by the votes, are to be ascertained. * * * The difficulty of undertaking to trace with accuracy the history of an investment by a corporation made many years ago and the sources of all the money that went into or contributed to it, and the wisdom of adopting some rule, are well illustrated by the attempt of the petitioners to trace and state the history of the distribution under consideration." Reference was then made to the rule that in determining the rights of life tenants and remaindermen, cash dividends, however large, are regarded as income, and stock dividends, however made, as capital, and the court said: "The stock dividends to which reference is made in the rule quoted, ordinarily mean shares in the corporation declaring the dividend. By the issuance of such stock against net earnings they become capitalized. The earnings so capitalized may already have been employed in the enlargement of the capital investment of the corporation and devoted to its physical plant. When a dividend is declared of stock of another corporation, a distribution of such stock in its legal effect ordinarily is like a cash dividend. The dividend in the case at bar in stock of the securities company had the characteristics of a dividend of income. It diminished the property of the railroad company but left the proportional interest of each stockholder in remaining corporate property exactly what it had been be-

fore. The stock of the securities company, if retained by the trustees, would not be an investment in the railroad company. Until a distribution is ordered, all assets held by a corporation as a part of its corporate property are capital, so far as the rights of life tenant and remainder-men are concerned." With regard to the status of investments made in real property used in the business of the corporation the court said: "Apart from special limitations in its charter or by statute there would seem to.be no sufficient reason for a fixed rule that an investment of capital assets of a corporation, whatever their source, in a wasting property like a coal mine, or in other real property used in the business of the corporation, should irrevocably mark that property as a capital asset. So long as it remains in the form of real estate it is not available for distribution. But in principle there should be no difference in respect to capital assets between an expenditure for real and one for personal property. It is desirable that power be imposed in the corporation to convert assets into such form as will best promote its legitimate objects. As a general rule, assets do not change their character by investment beyond the general powers of directors to alter them. * * * Upon the record there would seem to be no sufficient ground for reaching the conclusion that the corporation was not justified in carrying to the surplus account the proceeds of the coal properties in 1921 and in declaring a dividend from surplus in 1927. The dividend clearly appears to have been intended by the corporation as a partial distribution of surplus. No question is raised as to the good faith of the officers." The court goes farther than this, however, and says: "But it is not necessary that the case rest on that ground, alone, for if it be assumed, without so deciding, that there had been an 'effectual capitalization,' within the meaning of those words in *Hemenway* v. *Hemenway*, 181 Mass. 406, 411, of the whole or a part of the coal properties sold, and that this character was likewise impressed on the bonds

received in exchange, it does not follow that the bonds, or the stock received for them, could not be made available for the payment of a dividend from surplus, provided their equivalent in value remained in the surplus or otherwise continued to be held as assets of the corporation so that the capital would not be impaired. So long as the assets of a solvent corporation are equal to or in excess of its liabilities, plus its original capital, with such additions thereto as may have been made, the capital cannot be said to be impaired. The dividend in the case at bar caused no impairment of capital. The surplus remaining after the distribution was more than equal to the face value of the bonds received from the sale of the coal properties, and, so far as appears, to the actual value of those bonds. The case is the same in principle as it would be if a cash dividend had been declared from surplus and the railroad company had continued to hold the bonds. If the capital of the corporation is not impaired, the principal of the trust fund, in so far as it consists of shares in the corporation, cannot be said to be depleted. The distribution of stock of the securities company was in no proper sense a distribution in partial liquidation nor a step in winding up the corporate affairs either of the railroad company or of the securities company, and cases such as *Gifford* v. *Thompson,* 115 Mass. 478, and *Brownell* v. *Anthony,* 189 id. 442, holding dividends in liquidation to the capital, do not apply." Referring to the case of *Heard* v. *Eldredge,* 109 Mass. 258, which is strongly urged upon us by plaintiff in error here, the court said: "In the case of *Heard* v. *Eldredge,* 109 Mass. 258, a part of the real estate of a wharf company, whose right to own real estate was within strictly defined limits, was taken by eminent domain, and a part of the damages paid for the taking was distributed as a dividend. The officers of the corporation made no declaration that the dividend was paid from surplus. The source of the dividend was easily traced, and upon the evidence appearing in the origi-

nal record the finding would have been justified that the dividend could not have been paid from surplus without impairing capital. The court apparently treated the distribution as a payment in the nature of a partial liquidation. * * * The payment in *Heard* v. *Eldredge* has been referred to in later decisions as one made from capital. That case is not authority for the proposition that the stock distributed in the case at bar must be held to be a distribution of capital."

Practically all of the substantial points made by counsel in the within case were considered by the Massachusetts court in the *Gray case,* and the quotations above set forth constitute answers which are fully applicable here. It is urged that there is a difference in fact, in that the Tribune Company could not sell its real estate without the consent of two-thirds of the outstanding stock, whereas the railroad company in the *Gray case* is not shown to have been subject to any such restriction. Under the record here presented we cannot regard such difference as vital. Even though there was an "effectual capitalization" of the assets represented in the Dearborn and Madison building, the dividend paid brought about no impairment of capital. The surplus remaining after the distribution was more than equal to the consideration received for the building and leaseholds, and upon no proper or substantial basis can the principal of the trust fund, in so far as it consists of shares in the Tribune Company, be said to be depleted. There was therefore no valid reason why the stock of the Dearborn and Madison Building Corporation could not be made available for the payment of a dividend from earnings or surplus. No point is made against the good faith of the stockholders and directors of the Tribune Company in declaring by resolution that the payment should be out of the last accumulated earnings of the corporation. The corporate intent as expressed by resolution is unmistakable, and under all the circumstances here shown that intent must be given effect.

The chancellor erred in holding that the dividend did not constitute income, and the judgment of the Appellate Court is therefore affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*

DUNN, C. J., and DEYOUNG, J., dissenting.