Agnes Hines Burns et al., Appellees, v. Loretta A. Hines et al., Appellants.

Gen. No. 39,031.

Opinion filed February 14, 1939.

WINSTON, STRAWN & SHAW, of Chicago, for appellants; JOHN D. BLACK, JOHN C. SLADE, ARTHUR D. WELTON, JR., and RAYMOND O. MITCHELL, all of Chicago, of counsel.

TAYLOR, MILLER, BUSCH & BOYDEN and THEODORE HARDEEN, JR., all of Chicago, for certain appellees; JAMES J. MAGNER and WHITNEY CAMPBELL, both of Chicago, of counsel.

ALEXANDER J. RESA, of Chicago, for certain other appellees.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On March 13, 1936, in the circuit court of Cook county, a decree was entered against defendants, Loretta A. Hines, Ralph J. Hines and Charles M. Hines, for the sum of $212,693.41, and for their removal as trustees of a trust which the late Edward Hines created by a trust agreement dated June 22, 1914, to reverse which this appeal is prosecuted.

The complaint in chancery was filed April 7, 1934, by Agnes Hines Burns, a sister of Edward Hines, and by the three children of a deceased sister, Rose Hines Purcell, as beneficiaries of the trust, against Loretta A., Ralph J., and Charles M. Hines, the widow and sons of Edward Hines, as trustees of the trust and individually. The complaint named other defendants, who, in the decree, were dismissed from the action without prejudice. By leave of court, before hearing, four children of Agnes Hines Burns, namely, Dorothy L., Ruth E., John E., Jr., and Dalton F. Burns, became additional parties plaintiff. Defendants filed answers and the cause was heard before the chancellor, without a reference, on the pleadings, a written stipulation as to the facts, various exhibits, and testimony of witnesses. On June 22, 1914, Edward Hines executed a trust agreement whereby he transferred to his wife, Loretta A. Hines, and to two business associates, Christian F. Wiehe and F. E. Weyerhaeuser, as trustees, his entire stock interest, consisting of 1,700 of the 3,000 outstanding common shares of the Edward Hines Lumber Company, an Illinois corporation, of which he was president and a director, and his entire beneficial interest in the properties then being held in trust by himself, Christian F. Wiehe and L. L. Barth, as trustees. The latter trust had its origin in 1902 and 1904, when the stockholders and directors of the Hines Company transferred to said trustees approximately $4,000,000 in cash from the Lumber Company's earned surplus, for use in the purchase of timber lands, or timber rights. By that action the beneficial interest in the trust was vested in the then shareholders of the Lumber Company, including Edward Hines. On December 31, 1914, these assets had a value of approximately $14,000,000. About January 1, 1918, the trust assets of the trust that originated in 1902 and 1904 were segregated into two common law trusts, known

respectively as "Edward Hines Yellow Pine Trustees" and "Trustees of Lumber Investment Association," each of which issued 3,000 shares or certificates of beneficial interest to the shareholders of the Edward Hines Lumber Company, on the basis of their share ownerships. Of the certificates thus issued the trustees of the Edward Hines Trust received 1,802.12 shares in each common law trust. At the same time they received 102.12 additional common shares of the Lumber Company. The *corpus* of the Edward Hines Trust consisted of:

(a) 1,802.12 common shares of Edward Hines Lumber Company;

(b) 1,802.12 certificates of interest in Edward Hines Yellow Pine Trustees; and

(c) 1,802.12 certificates of interest in trustees of Lumber Investment Association.

Edward Hines, the settlor of the Edward Hines Trust, was president and a director of the Edward Hines Lumber Company during the entire period from June 22, 1914, until his death on December 1, 1931. He was also one of the original trustees of each of the common law trusts created January 1, 1918, and remained such trustee until his death. By the trust instrument Edward Hines made provision for his wife and children, for his four living sisters and their children, for the two children of a deceased sister, for certain persons unrelated to him, and for a gift of $100,000 to charitable uses. Distribution of the income and, ultimately, of the principal of the trust was directed to be made during three principal periods, chronologically arranged as follows: First: The period of five years immediately following the date of the execution of the trust instrument, or until June 22, 1919. During this five-year period the entire net income of the trust or such part of it as she might request, was directed to be paid to Mrs. Hines. Second:

From the expiration of the first period until such time as five special trust funds of $100,000 each should be created for the settlor's four living sisters and their children, and for two children of a deceased sister. During this second period there was to be paid out of the net income of the trust $25,000 per year to Mrs. Hines, and $5,000 per year to each of the four sisters of the settlor, namely, Agnes Hines Burns, Rose Hines Purcell, Mary Hines Sattler and Millicent Hines Clubine; and to Trude A. Wiehe and Hazel M. Wiehe, nephew and niece of the settlor, $2,500 each. The $25,000 annuity to Mrs. Hines was made a prior charge on net income, and the trustees were required to make up any deficiency therein out of principal. The annuities to the others were payable only if the net income of the trust exceeded the $25,000 payable to Mrs. Hines. During the period the trustees were directed to ''invest'' and ''accumulate'' any net income not required for the payment of the annuities, ''as well as any other money received from the sale or distribution of any of the property,'' conveyed to the trustees in a separate fund until it amounted to $500,000, when it was to be divided into five equal, special funds. Third: After the five special funds were established the annuities to the four sisters and the nephew and niece were to cease; the trustees were to hold one of the special funds for each of the four sisters, paying the entire net annual income to such sister during her lifetime and after her death to her surviving children, if any, and to pay to each such surviving child his or her pro rata share of the principal of the fund upon his or her reaching the age of 21. The fifth fund was to be held for the nephew and niece of the settlor with provision for payment of the principal to them or the survivor of them upon attaining the age of 25. Out of the residue of the trust estate remaining after providing for the foregoing, the trustees were directed to pay not exceeding $100,000

to such charitable or benevolent object as the settlor's wife might select, and in default of her selection, then to such as the "trustees may select." At the same time the trustees were directed to make outright payments of specified amounts, aggregating $31,000, to certain named persons, and to provide a trust fund for three others sufficient to yield $2,000 annually. The instrument then directed that the entire residue of the trust estate, and all the rents, incomes, gains and profits thereof, should thereafter be held in trust and managed for the benefit of the settlor's wife and children, namely, Loretta A. Hines, Louis Edward Hines, Ralph J. Hines, Charles M. Hines and Loretta Hines, and any subsequently born children, in the following proportions: One-half of said residue for the settlor's wife, and the remaining one-half for said children in equal proportions. There were no children born after the date of the trust instrument and the son, Louis Edward Hines, died on June 14, 1918, before the separate funds for the settlor's sisters had been set up. Mrs. Hines was given the entire income of said one-half portion for life, with a general power of appointment over the remainder either by will or by deed. The children's share of the income was to be used to provide for their care, support and education until they respectively reached the age of 25 years. At that time the trustees were authorized to pay to each of the male children one-half of his share of the principal, and to pay him the remainder of the share when he reached 30 years of age. In the case of the daughter, Loretta, only the income of her share was to be paid to her after she became 25; the principal was to go to her children after her death. Article I of the trust instrument gave the trustees broad discretionary powers of management, including the power to "invest, reinvest, and dispose of" the trust property; to "receive and have all dividends, distributions, rents, income and

accumulations of, or upon said trust property or any part thereof, including distributions of capital assets,'' and to exchange any of the property or interest in the property conveyed to the trustees by the settlor, for stock in corporations, or for shares or interests in any trust, which they might become entitled to take or have by reason of their ownership of said property. They were empowered to invest and reinvest any moneys coming into their hands after paying taxes and expenses and the several annuities provided for in the instrument, ''in such good, interest bearing securities or income producing property, real or personal, as said Trustees may select,'' without regard to whether such investments were in securities or property that the laws of Illinois, or of any other State or territory, might prescribe as proper for the investment of trust funds. The last sentence of the article stated: ''But this shall not be deemed, or taken as an authority to invest money in any stock of corporations, unless the same shall be then established as an income producing stock.'' Article II was a limitation on the trustees against a sale of a part only of the stock and beneficial interests transferred to the trustees. Article V, which will be constantly referred to, provided in part: ''Any net income derived from said Trust Estate that may remain after paying the annuities hereinbefore provided for, including as much as may be paid annually to Loretta A. Hines during said period of five years, as well as any other money received from the sale or distribution of any of the property hereby conveyed, shall be invested and accumulated in a separate fund until such fund shall amount to Five Hundred Thousand Dollars ($500,000.00). When such sum of Five Hundred Thousand Dollars ($500,000.00) shall be accumulated the annuities hereinabove directed to be paid to the sisters and the nephew and niece of said party of the first part, shall cease, and said Trustees

shall divide the said fund into five (5) equal parts, and thereafter hold one of such one-fifth parts in trust for each of the sisters of said party of the first part hereinbefore named so long as she shall live, and pay over to such sister during her lifetime the net annual income derived from such one-fifth (1/5) part.'' Article IX gave the trustees power to terminate all the trusts created at any time, at their election, and required the trustees so to elect if the settlor should at any time so request by an instrument in writing duly executed, as specified in said article. Unless so terminated, the trusts created by the instrument were to continue until fully performed and carried out, but were to terminate in any event at the expiration of 20 years after the death of the last survivor among the wife and children of the settlor, his four sisters, and Trude and Hazel Wiehe. Article X provided that in the event the trusts were terminated during the lifetime of the settlor, then the trustees were required to transfer, assign, convey and deliver over to him ''all of the Trust Estate then in their hands''; that in the event the trusts were terminated after the death of the settlor, ''then any part of such Trust Estate then held in trust for any person, for the purpose of paying the income thereon to such person, during his, or her life, shall be conveyed to such person.'' In an instrument executed by the settlor on December 24, 1923, and filed with the trustees, the settlor relinquished his power to compel the trustees to terminate the trusts, and surrendered the right reserved to him in said Article X to receive any part of the trust estate in the event the trustees should terminate the trusts before the settlor's death. Article XII directed that there should be at least three trustees, and that each of the settlor's sons should become a trustee upon attaining the age of 25 years. Under that article, Ralph J. Hines became a trustee on June 22, 1925, and Charles M. Hines became

a trustee on September 19, 1926. Of the three original trustees Christian F. Wiehe resigned on April 28, 1923, and died April 30, 1924; F. E. Weyerhaeuser resigned on December 31, 1929. Mrs. Hines died on March 31, 1938, while the cause was pending on appeal in this court. On May 24, 1938, the death of Mrs. Hines was suggested, and, on motion, Charles M. Hines, as administrator of her estate, was substituted as appellant. M. L. Hudson was elected a trustee on May 19, 1923, to succeed Mr. Wiehe, and served until his death, April 10, 1934. Article XIII, frequently referred to as the immunity clause, provides in part: ''So long as they continue as Trustees, they shall not, nor shall any one or more of them be held liable in any manner for any loss to said Trust Estate which is not caused by the wilful misappropriation of said estate, or some part thereof to their own use by them or some one or more of them, and then only shall the Trustee, or Trustees participating in such wilful misappropriation be held liable.'' From June 22, 1914, until June 22, 1919, the trustees paid the entire net income to Loretta A. Hines, the settlor's wife. This net income amounted to $42,500 during each of the years 1915, 1916 and 1917. No net income was received or distributed in the year 1914 or in either of the years 1918 or 1919. The amount of income received and paid to Mrs. Hines in 1920 was $10,266.68, and in 1921, up to July 21, $9,460.50. On or about May 18, 1920, the Edward Hines Lumber Company created an issue of 30,000 shares of 7 per cent cumulative preferred stock of the par value of $100 per share, the dividends thereon being payable quarterly, and 2,703 of such preferred shares were at about the same time distributed to the trustees as a dividend upon the 1,802.12 common shares held by them in trust. On July 21, 1921, 9,010 additional preferred shares of this issue were also received as a dividend on the trustees' holdings of common stock, thereby bringing the

total receipts of preferred shares by the trustees to 11,713. Shortly after receipt by the trustees of the additional 9,010 shares of preferred stock, the trustees set aside 1,000 shares, of the par value of $100,000, as a special trust fund for each one of the four sisters and their respective children. A certificate representing a like number of shares was delivered by the trustees to Trude Wiehe, who had then passed 25 years of age. His sister, Hazel Wiehe, died on January 24, 1915. Since Mrs. Hines was entitled to a minimum of $25,000 per year during this period, there was a deficiency in payments to her of slightly more than $30,000. There was, accordingly, no money available with which to pay anything on account of the subordinate annuities. The action of the trustees in setting up the special funds in preferred shares of the Lumber Company was taken on the advice of Mr. William S. Bennet, general counsel for all the Hines lumber interests, who delivered a written opinion to Mrs. Hines and sent a copy to Mr. Wiehe, and discussed the subject matter with Mrs. Hines and Mr. Wiehe. He also furnished a copy to and discussed the subject with N. H. Clapp, of Clapp & Mecartney, of St. Paul, Minnesota, the personal attorneys of Mr. Weyerhaeuser, who said that they thought Mr. Bennet's view was correct. Mr. Bennet testified that upon telling the settlor of the substance of what he (Bennet) had written in his opinion, Mr. Hines said that it "seemed right to him." In addition to the oral expression Mr. Hines gave written approval in an instrument executed and acknowledged by him and filed with the trustees on December 24, 1923, wherein he relinquished his reserved power to require the termination of the trusts and the reconveyance to him of all the property. In the form of a recital in that document Mr. Hines stated that the trustees had performed and carried out all the provisions of Articles III, IV, V and VI of the trust instrument so far

as it was then possible to perform them and had set apart the several separate funds therein provided for, leaving the residue of the trust to be administered as provided in Articles VII and VIII. On September 14, 1921, the trustees mailed to each of the settlor's sisters a letter apprising her of the terms of Article V; of the fact that on July 21, 1921, they had completed the accumulation of the $500,000 fund mentioned in Article V in preferred stock of The Edward Hines Lumber Company; that the trustees had set aside, for the sister to whom the particular letter was addressed, a certificate bearing a designated number (varying in each case) for 1,000 shares of said preferred stock of a par value of $100 per share, and "entitled to preferred dividends at the rate of seven per cent per annum after July 21, 1921"; that subject to a proportionate share of the expenses of administration of the trust estate the entire income of the fund would be paid in quarterly instalments on the first of March, June, September and December in each year; and that the income of the trust had not been sufficient, since June 22, 1919, to pay the $5,000 annuity to each of the sisters as provided in Article IV. Under date of October 27, 1921, each of the sisters signed and delivered to the trustees a formal written instrument acquiescing in the action taken by the trustees and releasing them from all further obligation under the trust instrument, except the obligation to hold the preferred shares in trust and to pay her the income therefrom as provided in the trust instrument. Beginning in 1921 the income of each of the special funds, less a small expense deduction, was paid to the sister entitled thereto in quarterly instalments. Mrs. Purcell died in the year 1925 and the income was thereafter paid to her children, the Purcell plaintiffs. These quarterly payments continued without interruption up to and including the month of June, 1931, a 10-year period. At that time payment

of dividends by the Lumber Company was suspended and never again resumed. In 1933 the assets of the Lumber Company were appropriated to the prior claims of its creditors through the medium of a reorganization. After the creation of the special funds under Article V, the trustees made the distributions provided to be made in Article VI out of the shares of preferred stock remaining in their hands as trustees. Mrs. Hines selected the Catholic Bishop of Chicago as the beneficiary of the $100,000 directed to be given by Article VI, and a certificate for 1,000 of such preferred shares was delivered in satisfaction thereof. Specific payments to the other beneficiaries named in Article VI were made in such stock at its par value, and 300 shares were set aside as a fund therein provided to be set up for Veronica Masek, Marie Smazek, Agnes Schoeppe, and John McGarry, Sr. Thereafter the trustees administered the residue and remainder of the trust estate for the exclusive benefit of the settlor's wife and his children. The trustees distributed all cash income of such residue in the proportion of one-half to Mrs. Hines, and the other one-half among the three surviving children in equal proportions. The cash sums thus distributed aggregated over $1,500,000. If the trustees had not created the special funds as they did in 1921, they could have created them out of cash income by the end of the year 1925. Article VII of the trust instrument, as to the shares of the residuary trust estate being held for the benefit of the children of the settlor, provided that each son should become entitled to receive one-half of the principal of his share upon reaching the age of 25 years, and the remainder upon reaching the age of 30 years. The trustees distributed to Ralph J. Hines property having a book value of $2,770,819.31, and to Charles M. Hines, property with a book value of $2,671,058.11, the dis-

tributions being made between June 22, 1925, and December 21, 1932. The Purcell plaintiffs demanded and received the certificates comprising the principal of their trust fund in January, 1932, and executed a receipt therefor, which states that the Purcell plaintiffs "hereby release the said Loretta A. Hines, Mortimer L. Hudson, Ralph J. Hines and Charles M. Hines, Trustees under the trust agreement made and dated June 22nd, 1914, by Edward Hines of their obligation under said Article V and any other part of the said Trust Indenture." On July 21, 1921, the assets of the Edward Hines Trust (before the segregation and distribution) were 1,802.12 Edward Hines Yellow Pine Trustees; 1,802.12 Trustees of Lumber Investment Association; 11,713 Edward Hines Lumber Company, preferred; 1,802.12 Edward Hines Lumber Company, common; and $60 cash. The cash income of the Edward Hines Trust from the date of its creation on or about June 22, 1914, to December 31, 1933, itemized by years, was: 1914, none; 1915, $42,500; 1916, $42,500; 1917, $42,500; 1918, none; 1919, none; 1920, $10,266.68; 1921 (to July 21) $9,460.50; 1921 (after July 21) $162,208.18; 1922, $82,863.67; 1923, $150,430.27; 1924, $93,132.45; 1925, $626,647.75; 1926, $225,912.34; 1927, $273,692.56; 1928, $109,563.24; 1929, $210,568.96; 1930, $244,097.48; 1931, $126,216.20; 1932, $31.87; 1933, $2.79; total, $2,452,594.94. The cash income of the Edward Hines Trust received from July 21, 1921, to and including April 30, 1933, was received from the following sources: Edward Hines Yellow Pine Trustees, dividends, $506,996.43; Trustees of Lumber Investment Association, dividends, $196,731.41; Edward Hines Yellow Pine Company, dividends, $744,857.01; Edward Hines Lumber Company, dividends on preferred shares, $712,067.33; other income, $141,203.89; total, $2,301,856.07. The capital and surplus or deficit position of the Edward Hines Lumber Company (not con-

solidated) on the dates hereinafter specified, was as follows:

| Date | Capital Stock Common | Preferred | Surplus or *Deficit | Book Value of Stock |
|---|---|---|---|---|
| June 22, 1914 | $300,000 | (Dec. 31, 1914) | *$ 262,054.45 | $ 38,945.55 |
| Dec. 31, 1920 | 300,000 | $ 348,700 | 2,560,849.05 | 3,345,549.05 |
| Dec. 31, 1921 | 300,000 | 1,947,700 | 198,618.79 | 2,446,318.79 |
| Dec. 31, 1926 | 300,000 | 2,599,500 | * 234,237.56 | 2,665,262.44 |
| Dec. 31, 1927 | 300,000 | 2,599,500 | * 95,288.70 | 2,804,211.30 |
| Dec. 31, 1928 | 300,000 | 2,077,100 | 50,750.27 | 2,427,850.27 |
| Dec. 31, 1929 | 300,000 | 2,077,100 | 330,896.19 | 2,707,996.19 |
| Dec. 31, 1930 | 300,000 | 2,040,500 | * 299,984.04 | 2,040,515.96 |
| Dec. 31, 1931 | 300,000 | 2,040,500 | * 2,159,314.93 | 181,185.07 |
| Dec. 31, 1932 | 300,000 | 2,040,500 | * 3,447,643.52 | 00.00 |

Starting in 1921 the cash income of the trust was sufficient to provide (1) payments in full to beneficiaries, and (2) accumulations to the fund provided for in Article V, as follows:

In 1921  To Loretta A. Hines............$ 25,000.00
         To four sisters.................  20,000.00
         To Trude A. Wiehe.............   2,500.00
         Balance to fund................ 124,168.68
                                         ───────────
                                         $171,668.68

In 1922  To Loretta A. Hines............$ 25,000.00
         To four sisters.................  20,000.00
         To Trude A. Wiehe.............   2,500.00
         Balance to fund................  35,363.67
                                         ───────────
                                         $ 82,863.67

In 1923  To Loretta A. Hines............$ 25,000.00
         To four sisters.................  20,000.00
         To Trude A. Wiehe.............   2,500.00
         Balance to fund................ 102,930.27
                                         ───────────
                                         $150,430.27

In 1924   To Loretta A. Hines............$ 25,000.00
          To four sisters.................  20,000.00
          To Trude A. Wiehe.............  2,500.00
          Balance to fund...............  45,632.45

                                        $ 93,132.45

In 1925   To Loretta A. Hines............$ 25,000.00
          To four sisters.................  20,000.00
          To Trude A. Wiehe.............  2,500.00
          Balance to fund............... 579,147.75

                                     $626,647.75

Thus in those years accumulations to the fund in compliance with Article V could have been as follows:

1921.....................................$124,168.68
1922.....................................  35,363.67
1923..................................... 102,930.27
1924.....................................  45,632.45
1925..................................... 579,147.75

                                      $887,242.82

In the circuit court all plaintiffs joined in the bill. Here, however, the Burns plaintiffs and the Purcell plaintiffs have filed separate briefs. The decree found, *inter alia,* that the preferred shares constituted an accretion to the *corpus* of the trust estate, did not constitute income to the trust estate, and did not constitute money received from the sale and distribution of any of the trust property, so as to qualify under the investment and accumulation requirements of Article V; that the action of the trustees in setting up the special funds did not constitute a compliance, in whole or in part, with the requirements of Article V; that the requirements of Article V were not otherwise complied with; that the trustees could have accumulated, not later than December 31, 1925, a separate fund of

$500,000, as provided in Article V, if they had invested and accumulated the net income of the trust over and above the amount necessary to pay annuities; that during the years 1921 to 1933, inclusive, the trustees made distributions of the income and *corpus* of the trust which were unauthorized and illegal by virtue of the fact that the separate fund of $500,000 had not been first created as required by Article V; that the unauthorized and illegal distributions amounted in the aggregate to a sum in excess of $500,000; that the unauthorized and illegal distributions were made principally to defendants Loretta A. Hines, Ralph J. Hines and Charles M. Hines; that such unauthorized and illegal distributions were made by the defendants as trustees to themselves as distributees; that by reason of the acts of the defendants a proper fund in the amount of $100,000 for the Burns plaintiffs was never created; that Agnes Hines Burns suffered an additional loss and damage in the sum of $6,146.71, said amount being the sum of $75,000 which should have been paid to Agnes Hines Burns from January 1, 1921, to December 31, 1935 (annuity of $5,000 per year for the five years 1921–1925, inclusive, plus $5,000 per year income from trust fund for 10 years 1926–1935, inclusive), less the sum of $68,853.29 which was paid to her as income during said period; that by reason of the acts of defendants the Purcell plaintiffs suffered a loss and damage in the amount of $106,146.71, less a credit of $600, making a loss of $105,546.71, divided as follows: Ted Edward Purcell, $34,782.25; Catherine Wiehe Purcell, $35,382.23; and Loretta Purcell Hackett, $35,382.23; that the instruments designated as releases and receipts were executed without the trustees' making a full, complete and accurate disclosure; and decreed that defendants be removed as trustees; appointed the Northern Trust Company as successor trustee; decreed that the instruments dated October 27,

1921, and January 19, 1932, being the receipts and releases, be set aside; that the defendants individually, and jointly and severally pay the sum of $100,000 to the successor trustee, to be invested for the benefit of the Burns plaintiffs; that the defendants individually, and jointly and severally pay to Agnes Hines Burns the sum of $6,146.71; that the defendants individually, and jointly and severally pay to Ted Edward Purcell the sum of $34,782.25; to Catherine Wiehe Purcell, the sum of $35,382.23, and to Loretta Purcell Hackett, the sum of $35,382.23.

Defendants maintain (1) that the five special funds set up in 1921 conformed to every essential requirement of the trust instrument, and discharged every obligation with respect to their creation that was imposed upon the trustees by Article V; (2) that there is no basis in the record for the damages assessed; (3) that the trust instrument expressly absolved the defendants from personal liability for any loss that may have resulted from the acts complained of; (4) that plaintiffs are estopped by their agreements and acquiescence to question the trustees' interpretation of Article V; and (5) that it was an abuse of sound judicial discretion to remove the defendants as trustees and to appoint a successor trustee. Plaintiffs insist that the setting aside of the preferred shares by the trustees in 1921 did not constitute compliance, in whole or in part, in form or substance, with the requirements of Article V of the trust instrument, and that the trustees have never complied with the requirements; that the damages assessed by the decree are supported by the record; that the immunity clause does not absolve the defendants from liability; that plaintiffs are not estopped by consent or acquiescence; and that the removal of the trustees and the appointment of a successor trustee constituted a proper exercise of judicial discretion. The Purcell plaintiffs are not

interested in the phase of the case involving the removal of the trustees. Defendants say that Article V literally provided the following steps for the creation of the five special $100,000 funds: "*First.* The investment, in a separate fund, of surplus 'net income,' as defined in Article V, and of 'any other money derived from a sale or distribution of any of the property hereby conveyed'; *Second.* The accumulation of the 'net income' and the 'other money,' so invested and to be invested, *until* 'such fund shall amount to $500,000'; and *Third.* The division of 'the said fund into five (5) equal parts.'" Defendants concede that "these precise steps were not taken by the Trustees in bringing about the creation of the five $100,000 funds, in the year 1921. . . . The Trustees did not accumulate a fund in the amount of $500,000 in cash, and did not accumulate a fund in that amount by the investment of income, at any time prior to July 21, 1921; and had no cash whatever available for such investment or accumulation prior to that date." At the outset it will be observed that if Article V is to be construed as requiring the net income, as well as "any other money received from the sale or distribution of any of the property hereby conveyed," to embrace only money or cash, then the $500,000 fund that was established did not have its source in "money." There are many cases holding that the word "money" is synonymous with "property," depending on the intention of the testator or settlor as disclosed in the will or instrument. From a consideration of the entire instrument and the facts and circumstances in the record, we are satisfied that the source of the fund to be invested and accumulated until it amounted to $500,000 need not be money. The inquiry at this point turns to a consideration of the three sources mentioned. As all parties concede that the preferred shares are not "money received from the sale" of any of the property conveyed

to the trustees, that phase of the problem may be dismissed from further consideration. We are then called upon to decide whether the preferred stock may be considered net income derived from the trust estate. Up to the present time the courts of Illinois have followed what is known as the Massachusetts rule. That rule was fully discussed in the case of *Gibbons v. Mahon,* 136 U. S. 549, and quoted with approval in the leading case of *DeKoven v. Alsop,* 205 Ill. 309, 316:

" 'A stock dividend really takes nothing from the property of the corporation and adds nothing to the interests of the shareholders. Its property is not diminished and their interests are not increased. After such dividend, as before, the corporation has the title in all the corporate property. The aggregate interests therein of all the shareholders are represented by the whole number of shares, and the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of the new ones.' "
Defendants urge that the Massachusetts rule should not be considered as the law in Illinois at this time, because in the case of *Koshland v. Helvering,* 298 U. S. 441, 80 L. Ed. 1268, 56 Sup. Ct. 767, decided May 18, 1936, Mr. Justice Roberts, speaking for the Supreme Court, decided that a common stock dividend declared on preferred stock was income and subject to taxation as income under the Sixteenth Amendment of the Federal Constitution. The court, at page 769, said:

"We are dealing solely with an income tax act. Under our decisions the payment of a dividend of new common shares, conferring no different rights or interests than did the old,—the new certificates, plus the old, representing the same proportionate interest in the net assets of the corporation as did the old,—does

not constitute the receipt of income by the stockholder. On the other hand, where a stock dividend gives the stockholder an interest different from that which his former stock holdings represented he receives income. The latter type of dividend is taxable as income under the Sixteenth Amendment.'' In that case the preferred stock was redeemable at $105 a share plus accrued dividends, and upon dissolution or liquidation was entitled to preferential payment of $100 per share, plus accrued dividends, and no more. The holders of common stock alone were entitled on dissolution to the assets of the corporation remaining after payment of the debts and the preferred. Plaintiffs point out that the facts in the *Koshland* case and in the case at bar present entirely different situations, and that while the *Koshland* case may be sound law as to federal income taxation the adoption of its rule with respect to trust law would be harmful. The parties call attention to the case of *Lloyd v. Lloyd,* 341 Ill. 461. There the stock of another corporation was distributed. Clearly the stock that was distributed was removed as an asset of the corporation. The Supreme Court held that the stock so distributed was income, but did not otherwise depart from the doctrine announced in *DeKoven v. Alsop, supra.* Our attention has also been called to *Whiting v. Hagey,* 366 Ill. 86 (opinion filed April 16, 1937). The facts in that case were somewhat similar to the facts in the *Lloyd* case. Mr. Justice Wilson, delivering the opinion of the court, said (pp. 91–93):

''The determination of whether certain dividends go to the life beneficiary of shares or to the remainderman depends primarily upon the intention of the creator of the fund, and the intention, when once ascertained from the language of the will or other instrument, and the surrounding circumstances, must be given effect. (*Gibbons v. Mahon,* 136 U. S. 549; *Blinn v. Gillett,* 208 Ill. 473.) Neither the will creating the Harris trust,

nor the trust agreement creating the Whiting trust, defines net income. The rule which obtains in this State with respect to the right to dividends as between a life tenant and a remainderman in such cases is known as the Massachusetts rule or 'the rule in Minot's Case.' (12 Fletcher's Cyclopedia Corporations, sec. 5393.) It regards cash dividends whether large or small, as income, and stock dividends, whenever earned and however declared, as capital. Cash dividends, therefore, belong to the tenant for life and stock dividends to the *corpus*. (*Minot v. Paine,* 99 Mass. 101; *DeKoven v. Alsop,* 205 Ill. 309.) In deciding whether a particular distribution is a stock or a cash dividend, the actual and substantial character of the transaction, and not merely its nominal character, may be considered. (2 Cook on Corporations (6th ed.) sec. 555; *Billings v. Warren,* 216 Ill. 281; *Blinn v. Gillett, supra; DeKoven v. Alsop, supra; Leland v. Hayden,* 102 Mass. 542.) When a dividend is declared of stock of another corporation, a distribution of such stock, in its legal effect, ordinarily is like a cash dividend. (*Gray v. Hemenway,* 268 Mass. 515, and 212 id. 242; *Leland v. Hayden, supra.*) Whether a dividend is to be regarded as income or capital is to be ascertained from the substance and intent of the corporate act declaring the dividend. (12 Fletcher's Cyclopedia Corporations, sec. 5395; *Gibbons v. Mahon, supra; Gray v. Hemenway, supra; Gifford v. Thompson,* 115 Mass. 478; *Leland v. Hayden, supra; Lloyd v. Lloyd,* 341 Ill. 461.) This doctrine is based upon the impracticability of determining the comparative rights of different persons in a particular share of stock, of going behind the votes of the corporation and its directors, and of investigating the corporate accounts and affairs, in order to ascertain how the corporation acquired the fund out of which the dividend was declared. *Lloyd v. Lloyd, supra; Gray v. Hemenway, supra.*'' At page 97 the

court points out that "the dividend in controversy was not a stock dividend . . . but was a dividend of stock or the proceeds of stock. In short, in the case at bar there was a distribution of surplus and not a capitalization of surplus." The opinion in the case of *Whiting v. Hagey,* was filed almost a year after the opinion in the *Koshland* case. It is manifest, therefore, that the doctrine announced in the *DeKoven* case, *supra,* is still the law of Illinois. Furthermore, at the time the trust instrument was executed the parties were relying on the law of Illinois as it then appeared in the books, and when the five special funds were set up in 1921 William S. Bennet, general counsel for the Hines lumber interests, delivered a written opinion stating that "concededly, this stock is not net income." There is testimony that Mr. Hines assented to the arrangement outlined in the letter of Mr. Bennet, and he also did so in the instrument executed in 1923, wherein he relinquished his right to revoke the trust and resume full dominion over the property that he had theretofore owned. We do not know of any case decided by courts in Illinois wherein it has been held that preferred stock paid on common stock is income. The record in the case at bar does not aid us in resolving the question. All we know is that the stock was 7 per cent cumulative preferred stock and that the dividends were payable quarterly. Under the law of Illinois the holders of preferred stock have the same right to vote as the holders of the common stock. We do not know whether on a dissolution of the corporation the holders of the preferred stock would have a right to a distributive share of the assets of the corporation over and beyond the face value of the preferred stock. Ordinarily on the dissolution of a corporation or the calling of the stock the holders of preferred shares have the right to receive only the par value of the stock plus accrued dividends. In view of the record in this case, which

does not disclose that the stock dividend in preferred stock gave the stockholders an interest different from that which their former stock holdings represented, and the expression of our Supreme Court in *Whiting v. Hagey, supra,* and the approval by the settlor of the plan set up in the Bennet letter, we are of the opinion that the preferred stock herein was part of the *corpus* of the trust estate and was not income. It is pertinent here to again call attention to the statement of our Supreme Court in *Whiting v. Hagey, supra,* that the determination of whether certain dividends go to the life beneficiary or to the remainderman depends primarily upon the intention of the creator of the fund. When the intention cannot be otherwise ascertained then the Massachusetts rule is applied. In the instant case it is clear that Mr. Hines, who until the execution of the instrument relinquishing his right to terminate the trust (on December 24, 1923) was the dominating power over the trust and its execution, well understood that the shares of preferred stock were not to be treated as income.

Having decided that the preferred stock did not constitute income to the trust estate, we are called upon to determine whether the setting aside of the preferred stock in the special funds was a "distribution of any of the property hereby conveyed." On July 21, 1921, the trustees possessed 11,713 shares of preferred stock. While we have held that such stock was not income, no one disputes that the directors of the Edward Hines Company had the right to issue and deliver such stock. The Burns brief states that "there can be no doubt that the trustees had the right to receive the preferred shares as dividends on trust assets received from the settlor. It is equally clear that the trustees could *hold* or *sell* the shares so received, as they might determine. But the trustees could not have *purchased* any of said shares for the trust, and had no right to employ such shares, whether received as dividends or purchased in

the open market, to create the separate fund provided for the sisters of the settlor by Article V." Plaintiffs contend that the preferred stock cannot be a distribution of the property conveyed by the settlor, because what the trustees already had could not be distributed to them. As a distribution of stock would not bring cash or money, it is apparent there is an ambiguity in Article V. Here it may be appropriate to observe that Article I states that the trustees shall receive and have "all dividends, *distributions,* rents, income and accumulations of, or upon said trust property, or any part thereof, *including distributions of capital assets,* if any there be." The word "distribution" as used in Article V is broad enough to include a distribution of capital assets. No one has urged that the distribution of the preferred stock to the trustees was in effect a distribution to themselves as trustees of the five special funds. In effect the five special funds are a trust within a trust. Since the preferred shares did not constitute income to the trustees they were a distribution of capital. The additional capital assets consisting of the preferred stock came to the trustees from what the settlor had originally conveyed to them. Hence, it constituted a distribution to the trustees within the meaning of Article V.

In logical sequence, the next point to be determined is whether the setting aside of the five separate funds constitutes an investment and accumulation. In resolving that proposition we should consider not only the trust instrument but all the surrounding circumstances. In a broad sense the assets of the trust came from the energy and ability of Edward Hines. He was well acquainted with the lumber and timber industry and backed his confidence to such an extent that he allowed the surplus profits to be accumulated and remain in the business for further expansion. Two of the three trustees, as well as the settlor, were directors of the corporation. Therefore when the dividend in

preferred stock was declared the settlor was a dominating factor in that action. He was informed of the plan to set up the five special funds out of the preferred stock, and acceded thereto. Until December 24, 1923, he had the power to terminate the trust. Until he did terminate it, as a practical matter his wishes were bound to be respected. When he relinquished the right to terminate the trust by the instrument of December 24, 1923, the special funds had been set up and the beneficiaries thereunder were receiving the income being derived from the preferred stock. Plaintiffs argue that the record shows that the action in setting up the special funds out of the preferred stock was brought about by the insistence of Mrs. Hines. It is true that until after the 5-year period and until the special funds should be established her income out of the trust could not exceed $25,000 per annum, and her children would not receive any of the income. It is likewise true that if the net income of the trust did not exceed $25,000 per year the plaintiffs would not receive anything. The setting up of the special funds permitted the trustees to pay Mrs. Hines one-half of the income from the residue and the other one-half to the children. It also permitted the trustees to pay the plaintiffs the 7 per cent income from each of the $100,000 funds as and when declared. At the time the special funds were set up in 1921 the trustees could not have been certain that by the end of 1925 the accumulations from cash income would be sufficient to set up the five special funds in cash. Apparently, up to the time of his death the relationship between the settlor and his wife and children was harmonious. It is inconceivable that the settlor would have executed the document relinquishing his right to terminate the trust if he suspected that his wife and sons and close associates might be charged with wrongdoing in setting up the special funds. There cannot be any doubt that

had any of the beneficiaries intimated prior to December 24, 1923, that he or she questioned the method in which the trust was being executed that the settlor would not have executed the instrument relinquishing his right to terminate the trust. As pointed out, that instrument recites that Articles III, IV, V and VI had been performed so far as it was possible for them to be performed up to that time. It may also be pointed out that the directors of the corporation could have sold some of their surplus assets and paid dividends in cash. Had they done so, no dispute would have arisen. It is conceded that the trustees did not "invest and accumulate" any income, money or property. They created the special funds directly out of the preferred shares by setting aside for each sister and her children a certificate for 1,000 shares, having a par value of $100,000. They gave written notice of this action to each of the sisters, including the mother of the Purcell plaintiffs. In their notice they quoted Article V *verbatim* and requested, and later received, each sister's unqualified written acceptance and assent thereto. Commencing in December, 1921, each sister received and accepted the net income of her fund quarterly without objection up to and including the month of June, 1931; and after the death of Mrs. Purcell her children received and accepted the income from their fund to and including the month of June, 1931. It is the contention of defendants that the five special funds created in 1921 conformed in every essential to the requirement of the trust instrument and that even if the action of the trustees did not conform to the strict letter of Article V it did conform to the spirit and intent of the trust instrument, and accomplished the purpose or object of the settlor. In the case of *In re Adriance's Estate*, 145 N. Y. Misc. 345, 260 N. Y. Supp. 173, testamentary trustees invested in participation certificates in a first mortgage on a hotel located in and

owned by a New Jersey corporation. Because of a provision of the New York statutes the investment was unauthorized. Negotiations for their exchange were entered into between the trustees and the American Bond & Mortgage Company as a result of which it was arranged that the bonds should be returned and certain bonds on property on Riverside Drive, in Manhattan, should be substituted. It was represented by the American Bond & Mortgage Company that the latter bonds were a legally authorized investment and that the property was improved by a 24-story building which was 60 per cent rented. The trustees relied on the statements. As a matter of fact the statements were wholly false, as no building had been erected. However, certificates for the new bonds were delivered to the trustees in exchange for the other bonds. About 13 months after the exchange the building was actually completed and the investment at that time would have been one authorized for trust funds. Subsequently the Bond & Mortgage Company became involved in financial difficulties and the value of the bonds purchased dropped perceptibly. The court (at page 179) said:

"In the case at bar, the unauthorized character of the investment ceased to be an effective cause of loss when that investment came within the legal definition of one proper under the provisions of the statute. Thereafter other causes, including the failure of the seller of the bonds and the world-wide depression of security prices, intervened, and became the causative influences leading to the present recession in the market values of the securities in question. Had the trustees in the present case sold these securities on the 11th day of August, 1929, and realized the full price paid for them, so that they had this sum in their hands for investment on the succeeding day, they would have been perfectly free, so far as the provisions of the statute are concerned, to have placed that sum in the iden-

tical securities which they had sold on the previous day and would not have been subject to criticism on this ground for so doing. The result in the present case is identical with that which would have occurred had such action taken place, and it cannot be supposed that their failure to indulge in such a futile hocus-pocus can alter the attitude of a court of equity toward their acts.'' Applying the reasoning in that case to the instant case, defendants say that the trustees exercised good judgment in setting up 1,000 preferred shares for each sister as the special fund contemplated by Article V. In addition to the other contentions plaintiffs maintain that in no event on July 21, 1921, did the preferred stock qualify under the clause of Article I reading, ''But this shall not be deemed, or taken as an authority to invest money in any stock of corporations, unless the same shall be then established as an income producing stock.'' Defendants rejoin that the clause quoted should be considered in connection with another clause of the same article reading that the trustees are empowered and authorized to invest any moneys coming to and remaining in their hands ''in such good interest bearing securities or income producing property, real or personal, as said Trustees may select without regard to whether or not such investments are made in such securities or property as the statutes of the state of Illinois, or any other state, or territory of the United States may prescribe as proper for the investment of trust funds.'' The instrument should be read as a whole. The 9,010 shares of preferred stock received by the trustees on July 21, 1921, were part of the issue of 30,000 shares authorized on May 18, 1920. The 2,703 shares of preferred stock issued on May 18, 1920, and at that time distributed to the trustees, paid regular quarterly dividends at the 7 per cent rate in September and December of 1920, and in March and June of 1921. By the large sur-

plus of the Hines corporation and the fact that the dividends had been paid on the 2,703 shares of preferred stock theretofore issued, the preferred stock on July 21, 1921, was established as income producing. Defendants point out that the 2,000 shares of plaintiffs herein could have been created wholly from the 2,703 preferred shares received on May 18, 1920. Outside of the stipulation the only testimony as to the value of the preferred stock is that of Mr. Bennet, who said that he purchased $7,000 of it at par during the years 1922, 1923 and 1928, and that in his opinion it was a "sound income producing stock." While on July 21, 1921, no one could with certainty say that the preferred stock would pay the promised dividends, the fact is that the stock did pay dividends continuously and uninterruptedly for a period of 10 years. Had anyone questioned the right of the trustees to set up the special funds by the use of the preferred stock the trustees could have sold preferred stock and purchased the same stock or other stock. A view of the entire situation impels us to the decision that the action of the trustees was a compliance with the true spirit and meaning of the trust instrument.

The second chief criticism leveled at the decree by the defendants is that the damages assessed are without basis in the record. We are of the opinion that even if the trustees erred in setting up the special funds when they did, the plaintiffs did not suffer any damages thereby. Looking at the case in retrospect, it appears that the preferred shares paid dividends of 7 per cent for 10 years and until the depression was 2 years under way.

Article XIII of the trust instrument provides that "so long as they continue as Trustees, they shall not, nor shall any one or more of them be held liable in any manner for any loss to said Trust Estate which is not caused by the wilful misappropriation of said estate, or some part thereof to their own use by them or some

one or more of them, and then only shall the Trustee, or Trustees participating in such wilful misappropriation be held liable.'' No one will contend that there was a wilful misappropriation of the estate. The provision would certainly protect the trustees from liability for an investment made in good faith. If the preferred shares set up in July, 1921, were not ''established'' income producing stocks in 1921, certainly the above provision of Article XIII would protect the trustees against claims. Here again we cannot consider the application of this provision disassociated from the events and people affected. Certainly the action of the trustees in setting up the special funds, which was concurred in by the settlor, who at that time had the right to terminate the trust, cannot be regarded as a wilful violation of the trust instrument. It must be remembered that the original trustees consisted of the settlor's wife and two of his trusted and close associates in the lumber enterprises, and that his sons eventually would become trustees. We are of the opinion that Article XIII would be a complete defense to the claims of plaintiffs even though the other contentions were resolved in plaintiffs' favor.

Defendants assert that the plaintiffs are estopped by their agreements and acquiescences to question the trustees' interpretation of Article V. As heretofore noted, the trustees mailed to each sister a letter apprising her of the terms of Article V; of the fact that on July 21, 1921, they had completed the accumulation of the $500,000 fund mentioned in Article V *in preferred stock* of the Edward Hines Lumber Company; that they had set aside for each sister a certificate, bearing a designated number, for 1,000 shares of said preferred stock of the par value of $100 each and entitled to preferred dividends at 7 per cent per annum after July 21, 1921; that, subject to a proportionate share of the expenses of administration of the trust estate, the entire income of the fund would be paid in quar-

terly instalments on the first of March, June, September and December in each year; and that the income of the trust had not been sufficient since June 22, 1919, to pay the $5,000 annuity to the sister provided in Article IV. Under date of October 27, 1921, each of the sisters signed and delivered to the trustees an instrument which recited the facts of the creation of the special fund in said preferred stock, and expressed the sister's complete agreement that it complied with the terms of Article V. Beginning in 1921 the income of each of the special funds, less a small expense deduction, was paid to the sister entitled thereto in quarterly instalments. Mrs. Purcell died in 1925, and the income was thereafter paid to her children. These quarterly payments continued without interruption until June, 1931. During the entire period plaintiffs raised no objection. The first objection was voiced in the complaint herein, filed April 7, 1934. The Purcell plaintiffs demanded and received the certificates comprising the principal of their trust fund in January, 1932. The letter of September 14, 1921, stated that there had not been sufficient income to pay Mrs. Hines her prior annuity of $25,000; hence, they were informed that the fund at that time had not been accumulated out of cash. A reading of the letter convinces us that there was a fair disclosure to the sisters and that they were given full information of all pertinent facts. Mr. Hines having approved the setting up of the special funds in the form of preferred stock and retaining the right to revoke the trust, it is obvious that the beneficiaries would not take any action that would be contrary to his wishes. The record shows that the Purcell plaintiffs knew about the letter and with that knowledge they demanded and received the stock and released the trustees. Mrs. Burns and the Purcell plaintiffs cannot now be permitted to raise their voices against the action of the trustees. We do not agree with the contention of defendants that the children

of Mrs. Burns do not at this time have an interest which may be asserted. The trust instrument provides that on the death of their mother they will receive the *corpus* of the fund pro rata. Inasmuch as it is conceded the *corpus* is nonexistent and that there is no hope that it will ever be restored (except through these proceedings), it becomes apparent that the Burns children have a right to assert their claim at this time. While there is testimony that one of the Burns children was present at the time the letter of September 14, 1921, was received by their mother, there is not sufficient evidence in the record to establish estoppel as to them.

Lastly, the defendants say that they should not be removed as trustees. As pointed out, Mr. Hines, the creator of the trust, and who had a right to terminate it, approved their actions. From what has been said it follows that the action of the court in removing the trustees was erroneous.

Therefore, the decree of the circuit court of Cook county is reversed and the cause remanded, with directions to dismiss the bill of complaint for want of equity.

*Reversed and remanded, with directions.*

JOHN J. SULLIVAN and FRIEND, JJ., concur.